Case number 23-5237. Farah Naz, appellant, v. Jennifer M. Granholm, Secretary of the U.S. Department of Energy. Mr. Shelley, amicus curiae for the appellant. Mr. Walker for the appellant. Good morning, counsel. Good morning. Mr. Shelley, please proceed when you're ready. Good morning, and may it please the court. I'm Anthony Shelley, the court-appointed amicus on behalf of the appellant, and I've reserved two minutes for rebuttal. The district court's decision below involves the simple misapplication of the familiar standard for stating a claim under Rule 12b-6. Under that standard, the plaintiff need only set forth a short and plain statement of her claim and make plausible allegations that, assumed to be true, could lead to legal relief. And that low threshold is even more generous for pro se litigants like Farah Naz. Yet the district court essentially made every inference against Naz and required her to use the district court's own language to show discrimination and retaliation at the pleading stage. The result was that she was denied her day in court on her plausible allegations. Reviewing her allegations with all inferences in her favor, Naz stated a claim against her for discrimination and retaliation, and the case should be returned to the district court for proceedings on the merits. I'd like to first briefly put Ms. Naz's allegations and theory of the case in their most favorable light, because that establishes that her allegations are plausible and state claims for discrimination and retaliation. And then I'd like to address a couple of the particular errors we deem in the district court decision. First of all, these are the essential allegations and facts. Naz has a master's degree from AU, and she worked as an economist at the Commerce Department for nearly 17 years with an unblemished performance record. She joined the DOE then in 2017 and for another 18 months received positive performance reviews. Then in October 2017, she testified in support of an Christopher Dickerson, and the allegations were specifically aimed at Naz's then superior, Dr. Pearl. But Naz alleged Pearl did not learn of that testimony until April 2018, evidenced by a sudden change in the way Dr. Pearl treated Ms. Naz, going from one of cordiality to belligerence and harassment. At that point, and from then on, from that point when Dr. Pearl learned of the allegations, the testimony Ms. Naz had made, from then on in a relatively rapid fashion, over 30 months, a series of materially adverse employment actions were thrust upon Naz by Pearl and by Pearl's successors, who Naz alleges sympathized with Pearl. So there was immediate creation of a hostile work environment from the moment Pearl learned of Naz's testimony, belittling, using racially charged language in a conversation with her, yelling at her. There were immediate behind-the-scenes emails designed to thwart reasonable transfers within the department. They came immediately after Pearl learned of the testimony. There were then repeated denials of training opportunities, denied telework opportunities. She was undeservedly placed on performance improvement plans. She was denied an automatic step-increased pay raise. She was given unwarranted poor performance reviews, as she states in her complaint, and she was subject to unreasonable project requirements. Can I ask, so the items that you just enumerated, are they all items that are in the plaintiff's complaint? Absolutely, they are. I guess, Michael, I have a follow-on question to that, which is, there's also some materials that are in the plaintiff's opposition to the defendant's motion to dismiss, including some allegations that go to, potentially go to, a discrimination claim. For example, on page five of the motion, there's a reference to a statement by Pearl, who said, burning with extreme anger and rage, chattered at me, you will not stay at a place where I will choose for you at a rate of $110 because you Indians slash Asian are accustomed to low standards of living and you cannot have a luxury of government's money, etc. So there's at least a couple of statements that are made, not in the complaint, but in the opposition to the motion to dismiss. Correct. And what is the, I don't know that there was a reference to those in the briefing, but it's in the underlying materials below. Correct me if there's a reference in the briefing, I'm all ears. In our brief, we did not refer to page five of that opposition to the motion to dismiss. Did you refer to the opposition at all? We did not. Okay. And so, and I take that as a given. So my, I guess my question is, if there are statements in that submission by the pro se plaintiff below, what are, what do we do with that? Yeah. Well, the question I think is, is the opposition to the motion to dismiss evidence of sort of amplification of her claims as stated in the complaint. And I will note that she not only had her complaint, but she had a supplement to the complaint, which could be deemed almost an amended amendment to the complaint. And just to elaborate on it, and you likely are very well aware of this, but we have decisions in which, Whole Foods is the main one, but we have decisions in which we've looked to this exact pleading, the opposition to a motion to dismiss, to elaborate on pro se plaintiff's allegations. I mean, I think that's particularly in the context of a pro se plaintiff. It's just that what the unique circumstances here is that for our purposes on appeal, what we're reviewing is a district court decision to grant a motion to dismiss. And if the plaintiff or no submissions before us draw our attention to that pleading, then we're naturally going to look at the complaint. But the fact of the record is that that pleading is there. Yes. Well, her complaint does note this conversation, does note this conversation that she, the conversation about the travel, about the trip that she- But it doesn't include this particular- It doesn't include that particular, because you Indians, Asians are accustomed to low standards of living. It does say it singled her out for her writing, because non-native people cannot write. Yes, that allegation- According to Mr. Pearl, Dr. Pearl. We've got that one, and that's the one. Yeah. So I would say this, for a pro se litigant, I'm certainly, these are helpful allegations, and it would be to Ms. Naz's benefit, to have these considered along with her complaint. I don't think we need them, because the complaint is quite voluminous. It has an Exhibit A and an Exhibit B that are quite detailed. And then she has the additional, she has the additional supplement. But these are helpful. The one thing I will say is, I don't think it should then allow the government to bring in everything that they then papered their motion to dismiss with, which was really a summary judgment motion. It was a motion to dismiss and a summary judgment motion. And so I would want to guard against that. If, for instance, including what Ms. Naz said in response to the motion to dismiss is going to open the door for the government to add hundreds of pages of materials that were attached to their motion to dismiss, I would oppose that. But certainly, if when a plaintiff who's pro se amplifies and gives details that aren't contradictory to her complaint, and does so in an opposition to motions to dismiss, and it's her own statement, this is her own statement, I would certainly have no objection to them being considered in further support of her case. So all of the consequences I mentioned occurred after Pearl learned of the testimony. And so what she describes is a typical situation of retaliation. They meet the plausibility standard because there's nothing outlandish about them. There's nothing against common sense that this could have occurred. It's not irrational to think that a superior would have would have reacted hostilely to testimony that she had engaged in racial discrimination. And what Ms. Naz did was actually far more than what she had to do under this court's case in Rashan versus Gonzalez, 438 F3rd 2011. And at 1220, the court said there on causation in order to survive a motion to dismiss, all the complaint has to say is the government retaliated against me because I engaged in protected activity. That's a direct quote. In order to survive a motion to dismiss, all the complaint has to say is the government retaliated against me because I engaged in protected activity. She has said that over and over and over. What case is that? This is Rashan versus Gonzalez. From what year? 2005. Yeah, that's pre Twombly and Iqbal. Yes, it is. It is. But I'm not aware that it's since it has since been cited. I'm not aware that it's it has that that standard. Can I want one consideration? Our cases put a lot of weight on the amount of time that passes between the protected activity and the adverse actions that are alleged to be retaliatory. And here it's it's at least six months. The testimony is October 2017. The hostility begins April 2018. We've said I think three or four months is usually too long. So what do you do with that? Well, her point is that the person who discriminated against her, Dr. Pearl, didn't know of that testimony. So how do we know that? Because she alleged we have to accept it as true. We have to accept it as true because she if that's the basis for that inference, there's nothing left. But she has timing. But she has also alleged that in March, let's say March, February, January of that year, from October to April, Dr. Pearl treated her well, was cordial. There were no questions about her performance. She got a good performance review. And then she says in April, she was she, which is just to say that there's a long time limit between the protected activity and the alleged retaliation that cuts against. But it's not it's not irrational to think that Dr. Pearl didn't know of the testimony until April. No, but if but the only basis for you're saying he didn't know the testimony is this passage of time. No, six months. That's right. The six months. I think what we have to do is look at the proximity of the adverse acts to Dr. Pearl's understanding of when the discrimination occurred. One other March of that year, one month before, that's when Mr. Dickerson, who had brought the racial discrimination claim left. And it's it's it is plausible to think that once he left, Dr. Pearl learned of all the details of the of the testimony and the in the case against her that was brought by Mr. Dickerson. And it is immediately after that that NAS suffers the initial bad treatment. The other thing I would say is what the what the timing rule is, is it's a presumption. You can assume an inference of retaliation if there's a close proximity. She doesn't need the presumption. She has a couple of other facts that clearly lead to an inference of of retaliation. One is for 17 years, she enjoyed wonderful employment and a wonderful employment situation, got no no demerits ever. She then testifies. And then all the all of the bad acts begin one by one by one. The only difference between the two periods is the testimony in between. In fact, one other fact, too, that's in her complaint is that in 2017, she did a very similar paper to the one in 2018 that that Dr. Pearl deems subject to performance review and failure. 2017, she got no criticism whatsoever for that paper. 2018, Dr. Pearl finds every aspect of it problematic. The only difference between the two the two situations is Ms. NAS testified in So she doesn't need the temporal presumption because the other facts add up to one where, well, plausibly, this all could have the sea change that occurred may have occurred because of her because of her testimony. Thank you, Mr. We'll give you a little time for rebuttal. Thanks. Good morning, Your Honor. May it please the court. Johnny Walker on behalf of the Secretary of Energy. I first want to address the standard. My friend cites Roshan, a 2005 case for this proposition that all a retaliation plaintiff needs to allege is that I engaged in protected activity and the government retaliated against me. This court has said explicitly that Roshan is no longer good law. That is in Ho versus Garland, 106 F 4th versus 47. So Roshan is no longer good law. And what the premise that my friend would have the court accept is precisely that that is all a plaintiff alleges. What he asked the court to do is to infer from the mere fact that Ms. NAS experienced unfavorable treatment in April of 2018 to infer from that unfavorable treatment alone that Miss Pearl, who supposedly perpetrated that unfavorable treatment, knew of the protected activity and perform the unfavorable treatment because of that unfavorable because of that protected activity. So they're trying to bootstrap the causation requirement of the retail, the causation element of a retaliation claim on a mere showing of protected activity and unfavorable treatment. And this court's case law, particularly Ho versus Garland, just does not allow for that. So you may well be right. I just don't remember it offhand. But you're saying that in Ho, the court specifically discounted the Roshan standard. The court said in no uncertain terms that it was joining a chorus of district judges in this circuit in rejecting Roshan and saying it is no longer good law after Iqbal. The court specifically referenced the Roshan language and said it was. Yes. And I mean, that makes sense from Iqbal. I mean, Iqbal itself is a discrimination case. And the holding in Iqbal was that the plaintiff could not simply allege that I was experienced unfavorable treatment. In Iqbal, it was designation as a high interest individual in a detention and just simply label that as discrimination. There needs to be plausible facts that support that kind of conclusory statement. Although all that may well be right, I'm just not immediately seeing where we said that in Ho. Can you just point me to it? It is a footnote. Oh, I see. I'm sorry. I don't have the exact footnote. Maybe it's in footnote two. Okay. Got it. Yes. Footnote two, page 51. So that gets to the requirement that there needs to be some kind of plausible facts going particularly to causation. And you just don't have those here. All of the protected that you can get that sometimes with a temporal proximity. There's just no temporal proximity between any adverse action and protected activity here. Ho goes on. Does it not to apply a standard that is somewhat less narrow than the one that you are urging upon us? I don't think so at all, Your Honor. I think what Ho says is that a plaintiff needs to allege plausible facts to establish three different elements for a retaliation claim. They must show that they engaged in protected activity. They must show that they experienced a materially adverse action. And they must show this is what counsel. I'm sorry. Oh, no question about that. Yes. But Ho also says that we have to resolve Ho's relevant allegations in the light most favorable to him and then consider their combined effect. And I understood that's what this complaint is all about. Here's an economist who's worked for 17 years, plus 18 months, and all of a sudden something happens. And what's happened? And she says the only thing that happened is she testified against her supervisor in a discrimination case. No, actually, Your Honor, the adverse treatment occurred many months after her testimony. She testified in October of 2017, and she doesn't experience adverse treatment as alleged in the complaint until April 2018. And that adverse treatment is not even something that's independently actionable. It's the fact that her supervisor got mad at her about a hotel reservation she had made and used some charged language. So there's a temporal difference between the protected activity and the adverse treatment. The way she tries to, or the way Amicus tries to bridge that is to ask the court to infer everything else needed for a retaliation claim from the mere adverse treatment alone, to infer that because she was treated poorly. I just want to understand these cases saying, oh, that's too long, this is too long, and that's too long, a gap. But then it says, post-complaint, however, does not rely solely on timing. And then we spend pages talking about all the other things. Right. No doubt, Your Honor. Wondering how this court is supposed to read allegations on a motion to dismiss appeal. I think the way to read, Ho, and something that we acknowledge is that temporal proximity is not the only way to create an inference of causation for a retaliation claim. You can show pretext, you can show differential treatment with other similarly situated employees, but none of that is here. And what I take Amicus's argument to be is to try to rely on temporal proximity, but then to close that gap by inferring sudden knowledge to coincide necessarily from the unfavorable treatment alone. So the way they would have the inference go is, my employer got mad at me about a hotel reservation, therefore she learned that same month that I engaged in protected activity. And there's just no reasonable inference to be drawn from that. Those are, that's a non sequitur. I just want to make this point that the clock that we're looking at appears to be frozen. Make sure that we have a clock that's maybe in operation somewhere, but we'll keep her up track. I'm happy to wrap up whenever your honors are finished with questions. I just want to make sure that our clock's actually functioning, but it is. Okay. You have a question? Yeah. Can I just follow up on one quick point? Sure. And that is the discrimination proceeding that Mr. Dickerson brought where Mrs. Nas testified. Did Mrs. Pearl appear as a witness? I want to clarify something about that. That was not an in-person hearing. What Mrs. Nas did was she filled out an under oath questionnaire as part of the investigation. Oh, we understand that. But the question is, did Mrs. Pearl participate in that proceeding? I don't think that's in the complaint. I would, I think it's- So she was the person being accused. Yes. So isn't it a reasonable inference to suggest that the commission sought her views? I think it is, your honor. I think that is a reasonable inference to say that she likely knew about Mr. Dickerson's complaint. I don't think there's any reasonable inference to be drawn that she knew about Mrs. Nas' separate testimony. That's typically done in a confidential process, and there's no reason that she would know about Mrs. Nas providing a separate affidavit. So I would, I take your point on temporal proximity. I was going to ask your your friend says on the facts of this case, we have a nice comparator, which is she does, she submits one report before and seems to be fine, different report after, and it gets not specific criticism about, well, what about this argument or that argument? It gets this sort of contrast between the two is perhaps suggestive. I think it's, I think it's somewhat conclusory when she says this report was the same as this other report that I, that was treated the same way. They did not get this criticism. There's no, she doesn't sort of like draw out any of those specific facts. And we also know what the criticism was about her California irrigation report is that she cut and pasted nearly all of it from the internet. And so I don't think it is plausible to believe that a government agency that is in the business of publishing studies for public use would find it acceptable for one of their researchers to cut and paste entire portions of their report from the internet and publish that on behalf of the Energy Information Administration. That's speculation, isn't it? And you don't know what the 2017 report did, do you? Well, I mean, the inference... I just want to understand, after reading Ho, and after reading some of the Supreme Court's more recent cases, it seems to me there's some loosening up from what there had been in these appeals on motions to dismiss, even after Iqbal. I don't read Ho that way, Your Honor. In fact, I think Ho stands in a very nice contrast to this case here. In Ho, like in this case, there was a non-promotion claim. In this case, Ms. Nas just says, generally, I was denied promotion opportunities, and it was because of retaliation. Actually, she said she was denied a step increase. That's separate. We addressed the step increase separately. We acknowledge that... Actually, they both involve money. Well, she doesn't specify any promotion as the problem, but in Ho, the plaintiff there specified a particular job that he had applied for. Oh, counsel, I'm just saying, by analogy, denial of a step increase, that denies the same thing, in one sense, as a promotion, more money. It may not change your job duties, but you do get more money. No, I can address the step increase separately. I think that's a separate issue from this general sort of allegation that she was denied promotion opportunities. But contrasting the general denial of promotion opportunities with Ho, in Ho, there was a particular job for which the gentleman had applied. He alleged that many of the, at least three of the people involved in the promotion were specifically the targets of his prior protected activity. He alleged that the ATF, which was the agency at issue there, had a particular need to fill this position, and that it declined to fill that position because he and another individual who applied for it had engaged in protected activity. So far more detail than Ms. Naz has with respect to any promotion that she was purportedly denied. And the court in Ho noted that it was a very close case, and that it only narrowly got over the line, and that any one of the allegations that Mr. Ho had made alone would be not enough. Here, Ms. Naz has none of those obligations, which is clearly not enough. On the step increase, that is a separate matter. That could be a denied promotion. That is the way that the district court read Ms. Naz's complaint, and it's the way we read it as well. But as we note, the only protected activity that that step increase was proximate to was her own filing of a complaint, and she had received a fails-to-meet-expectations performance rating before that. And that fails-to-meet-expectations rating is what rendered her ineligible for the step increase. So there's no causal connection to be tied to the intervening protected activity. Can I ask about the opposition to the motion to dismiss? Yes. So, before a district court is a general matter, when a case involves a pro se plaintiff, our cases say that an opposition to a motion to dismiss is the type of pleading that the court would take cognizance of, including factual allegations in there. You don't disagree with that? Not at all, Your Honor. Yes. Right. So then the question becomes, this one does have some allegations in it that go to discrimination, this one being this opposition to the motion to dismiss. What do we do with that on appeal? I think there are a few sort of caveats that I'll add to your observation. I think that Ms. Knauss filed a few things in the district court that were just document dumps, essentially. And I don't think there's any sort of obligation for a district court to go wading through document dumps and find evidence in the plaintiff's favor. It has to be presented by the plaintiff as such. I think that's right. There's got to be some apportionment here. But these are on the face of this pleading, and this is a particular pleading that this court has looked to in the past, including in the Whole Foods case. Yes. I mean, obviously, I don't think any of that stuff has been preserved on appeal. There's not been a basis to reverse the district court's argument. But I do want to address the comment that Your Honor highlighted about the hotel reservation. So that was a comment that was supposedly made by Ms. Pearl in this April 2018 incident with the hotel reservation. We certainly do not admit that she made that comment. Of course. But we do accept it as true on a motion to dismiss, as you must. So the only two discrimination claims in the complaint were over this lack of promotions and then the termination. So even if you have this indication of discriminatory animus on the part of Ms. Pearl, and it can certainly be inferred to be that, given the charge nature of the comment, it is not related in any way to any promotion that she was denied. As I said, the only sort of concrete promotion denial that she has in there is the step increase denial, which was under a completely different supervisor. That was under Mr. Gross. And then, of course, her termination was the result of a performance development period and notice of proposal proposed removal that Mr. Gross, not Ms. Pearl, put her on. So there's no connection between the alleged discriminatory actions and Ms. Pearl herself. She had no role in them. Then with respect to Gross, there's a statement also in the defendant's, the opposition to the motion to dismiss that says that Gross said, and again, it's just an allegation at this point, that Gross said that when in response to a request for religious accommodation, that their place of work was a workplace, not a religious institution, and he doesn't believe in Islamic religious extremism. And that's another comment that's in there. And I guess my question is more a procedural one, which is, you may have a response that even taking into account these allegations, which we take to be true at this stage of the proceedings, without saying that you acknowledge that they're true, of course, that they might not be enough. And we can consider that. But my question is a procedural one about what we do with the fact that they exist on appeal. What's the government's view about what we should do with that, given that it wasn't something that I think was brought to the district court's attention. So understandably, a district court may not have taken cognizance of it in the course of its decision. But we know that they're in there. And we know that our cases say that that type of fleeting is something that you take cognizance of in the case of a prosecutor. Yes, but I don't think there's any error on the part of the district court here when there was so many. I mean, I think her opposition consisted of something over 1000 pages. And so I don't think there's any. And then there were some multiple over 100 page. I think it was over 300 pages of supplement. Yes, it's not all the time clear when the brief is ending and the attachments are beginning and then the brief is picking back up. I think with such a prolix nature of filings made by Ms. Nas in the district court, maybe there are some truffles buried in there somewhere. I don't think the district court erred by not combing through every single page of those. I think that's generally true. Okay, then let me ask the question this way, because I think we're just not meeting. Suppose we have a case in which there's an opposition to a motion to dismiss that should be taken into account. You admit that there is such a case? Yes. There can be such a case because our cases say okay, suppose that we have such a case. And then in that case, the district court, for whatever reason, doesn't take cognizance of allegations in there. And it may be that those allegations were they taken into account wouldn't change anything. I'm willing to accept that, too. But let's just suppose that that sort of case exists. And then on appeal, we're confronted with that. That confluence of circumstances. What do we do with it on appeal? Like I say, I think that there is a question of whether or not it was adequately presented to the district court. If it's buried in thousands of pages of filings, I don't think the district court is obligated to construe all of that. In which case we could just affirm. I mean, but then we would be engaging with the comments and we were reaching the subsequent conclusion that the district court wasn't required to look at it because it was at page 573 of a 1,000 page appendix. No, 1,000 page filing, which I totally understand. But I'm hypothesizing a situation in which it's in smack dab in the middle of a seven. Just make it clear. Make it easy. It's a two page pleading. Okay. And it has some allegations in it and they just aren't referenced. What do we do with that on appeal? I think it's a it's a tough question. I do think there's a line between this obligation to construe the pleading in light of subsequent filings and forfeiture arguments and something that's not properly presented and highlighted is still subject to forfeiture in the district court. I think it's obvious and which would obviously permit the district court to disregard that. And obviously there's forfeiture rules that apply on appeal and we think those rules would apply here where those items buried in the record were not brought up on appeal. You do. You think that's a forfeiture on appeal here? Yes. Is there not an intelligible distinction between her district court opposition between the brief itself and the 1,000 pages of attachments? When I looked through them, I remembered being somewhat confused about because there's items in the attachments that she created. It's obviously her own work product. It's not clear if it was work product that was intended for presentations at the district court or that she just kept these sort of like as notes herself. Some of them I think I'm thinking of particularly I'm recalling my review of some of the supplements that she filed. They have sort of the district court's name and court number written on them, which makes it seem like they were something she prepared for presentation to the court. But I think in some places, yes, there is a difficulty to draw that distinction. And this one is, I mean, sorry, because just what I was the follow-up I was going to ask you is suppose we agree that the district court doesn't have to look through the 1,000 pages of attachments, but does have to look through what's in the actual brief in the in the opposition. And, you know, what result then? And suppose we do the same thing. Sure. The cutoff is the complaint and the opposition, not the truffles buried in the attachments. Sure, I guess then it becomes a question of even material presented in the brief, there's a question of how it is presented and whether or not it's incorporated into an argument. Because if it's not incorporated into an argument in a cogent way, then I think there's still forfeiture principles that would apply. So here it's on page five and page seven to eight of the brief itself, regardless of the attachments and everything else that the company's in. And they're just stated as facts. They're just just says, I asked her why the EIA, this is on page five, a travel agent had already made that reservation in Naples, et cetera, et cetera. Miss Kelly Pearl burning with extreme anger and rage replied by shouting at me, quote, you will stay at a place which I will choose for you at a rate of one hundred ten dollars because you Indian slash Asian are accustomed to low standards of living and you cannot have a luxury of government's money by staying at the Hyatt Regency Hotel at a rate of two hundred thirty six dollars per night. Close quote. That's just on page five on the pleading. It's not buried in an attachment. I guess there's still sort of a separate question as to whether or not it goes to the claims. Obviously, the district court doesn't commit an error by not addressing something that doesn't go to the claims. As I said here, we have the discrimination claims that issue are things that Mr. Gross did not Mr. Pearl. And I believe the statement that you just read was from Pearl about the hotel reservation in 2018. The denial of the step increase was much later by Mr. Gross. The termination was much later by Mr. Gross. And I think even with respect to Mr. Gross's statement that your honor mentioned, there still has to be on that logic. And Pearl could have said all kinds of stuff. There could be a litany of 300 pages of direct allegations about Pearl and it never would matter. And as a legal matter, we can have a question about that. But on the question of whether a district court appropriately apprised should take account of those allegations, that seems like a different. I don't know that it is. I don't think the district court needs to take account of allegations that are sort of gratuitous and don't go to the claims that are proposed. And it doesn't need to take into account allegations that are not sufficiently incorporated into an argument in favor of a claim so as to be forfeited. Wouldn't they go to a hostile work environment claim? At least I know you can have a question about whether the direct supervisors, if you envision one in which repeated claims over time is something that you can just entirely disregard, even if it's a subsequent supervisor who makes the decision. I mean, I don't think this complaint contains a hostile work environment claim. I think it references it, but it wasn't developed. Yeah, it hasn't been developed at all. I think we would have separate arguments about a hostile work environment claim for such a claim to be actionable. It would have had to be timely exhausted. It would have had to be a cogence and continuance and linkage of all the events. We know that the court has said that simply trying to regulate a civil workplace is sort of outside the bounds of a hostile work environment claim. It has to rise to something else. So I think we'd have a lot of arguments against a hostile work environment claim, so it wouldn't necessarily go to that. But like I said, nobody has sort of assigned any error with respect to the complaint not being construed as containing a hostile work environment claim. I'm sure my colleagues don't have additional questions. Thank you, counsel. Thank you very much. These are from the district court. Mr. Shadley, we'll give you two minutes for a rebuttal. Thank you. Just a few points. What Hoste takes aim at Rashaun for is threadbare allegations. And Ms. Naz's allegations are not threadbare. And I'd point the court to the appendix at 14, paragraphs 1, 5, and 7 particularly, where she concisely summarizes a retaliation claim. There she says, Farah Naz enjoyed an unblemished career of nearly two decades of service with the federal government. When plaintiffs spoke out against the rampant race discrimination that pervades the agency, she became the victim of a sustained and pretextual campaign designed to remove her from her position. Plaintiff performed her job capably and without critique for the first two years at the Department of Energy. But as soon as she agreed to testify against Dr. Kelly Pearl, a hitherto unimaginable degree of scrutiny was trained on plaintiff's every action. Management grew openly hostile to her, mocked her, and erected and resurrected a series of Byzantine obstacles to plaintiff's success that were used to destroy her storied career. That's not threadbare. I would also say, on the idea that Ms. Naz's paper, what was said about Ms. Naz's paper in 2018 is completely outside the complaint. The idea that it was subpar is not in Ms. Naz's complaint. In fact, she says the exact opposite, that it was an excellent paper and it was in the statements about it were pretextual. And then the last point I'd like to make is that there were consequences immediately after the April 2018 learning by Judge Pearl, excuse me, by Dr. Pearl of the testimony. One is Ms. Naz immediately asked for a transfer and she was told by one superior, see if you can get that, go talk to various people. And Dr. Pearl in April, May, and June sent emails to all these various people saying, don't talk to her, she's a complainer. And this comes after her testimony, after her testimony in favor of Mr. Dickerson. All those are in the complaint. There's nothing threadbare about it. And it states a typical claim of retaliation. She should have had an opportunity to go to the merits in the usual course and prove her claim. She was denied that opportunity by the district court. So we'd ask that you reverse the district. Thank you, counsel. Thank you to both counsel. We'll take this case under submission. Mr. Shelley, you are appointed by the court to present arguments in support of the appellant in this matter. And the court thanks you for your assistance. Thanks very much.
judges: Srinivasan; Katsas; Rogers